Nicholson, C. J.,
delivered the opinion of the court.
*168 The general facts on which the complainants seek relief are as follows:
Complainants are married women and sue by their next friend, their husbands being made defendants. Mary C. Murdock was married in 1835, and Lydia M. Jenkins in 1839, both their mothers having died previous to their marriage, and both have continued married women to the present time. Complainants are the descendants and heirs of two of the devisees under the will of Wm. Winchester, who died in Maryland in 1812, having made his will which was duly proven and recorded. Each of the complainants claims one-fourteenth interest in the several lots of ground sued for. They ask the court to declare this interest, and remove from their title the clouds resting thereon, by reason of certain conveyances under which the present claimants occupy and set up titles; but as their husbands are barred of their rights by the statutes of limitation, no writ of possession is prayed for. In the will under which complainants claim, the testator, after making provision for the occupation of certain portions of his land by his sisters, proceeds:
“I give, devise and bequeath all the rest, residue and remainder of my estate, real, personal and mixed, including the undisposed of interest in the lands above devised to my said sisters, unto my sons, Wm. Winchester and Geo. Winchester, their heirs and assignees, forever, in trust, that my said sons William and George, or either of them, or the survivor and the heirs of the survivor, shall and may sell and dispose of all or any part thereof, at such times, in such *169 maimer, and upon such terms as to them shall seem best and most advisable, and the money arising from said sale to apply in the following manner, to-wit: In the first instance, to pay and discharge the debt or sum of money due and owing by me to the president and directors of the Union Bank of Maryland upon certain promissory notes discounted at said bank for my use and accommodation, and I particularly enjoin and direct my said sons William and George to be diligent in the execution of this trust, in order that the said debt may be discharged as soon as possible without injury to my estate. Secondly, to pay and discharge the debt due by me to my brother, Daniel Winchester; and from and after the payment of the aforesaid debt, I give and bequeath unto my dear wife all my personal estate to hold the same to her, her executors, administrators and assignees, forever; and it is my will and desire, and I do devise, that my said sons, William and George Winchester, and their heirs, shall permit my dearly beloved wife to receive the rents and profits, and enjoy the use of my real estate during her natural life, and after her decease then the residue of my real estate to be divided into ten equal parts, one-tenth part whereof I devise and bequeath to Lydia Moore, -her heirs, etc.” He then gives one-tenth in like manner to nine others, and proceeds: “And it is my will and desire that my real estate shall be sold in the first instance to pay the aforesaid debts due to the Union Bank of Maryland and David Winchester, in exoneration of my personal estate, and that the personal estate shall not *170 be sold unless the proceeds of the real estate be inadequate to pay said debts. And lastly, I do hereby appoint and constitue my two sons, William Winchester and George Winchester, to be executors of this my last will and testament.”
The testator, Wm. Winchester, owned valuable real estate in Maryland and in Tennessee.
The debts specified in the will were paid and discharged out of the lands in Maryland — -the debt to David Winchester in 1828, and the debt to the Union Bank of Maryland on the 1st of April, 1837.
Complainants claim that upon' the payment of the debt to the bank, on the 1st of April, 1837, the title to the residue of the land, including that in Tennessee, immediately vested in the devisees of Wm. Winchester who were then living,- and the heirs of those who were then dead. " Such was held by this court in the case of Murdock v. Johnson, 7 Col., 604, to be the true interpretation of this will, and in that construction we acquiesce.
Wm. Winchester,, at the time of his death, owned an interest, as tenant in common with several others, in a grant of land of 5,000 acres situated in Shelby county, Tennessee, which was partitioned among the owners in 1828, when the share of the devisees of Wm. Winchester was set apart as their common property. The several lots to which complainants claim title in these suits are portions of the share of the Rice grant, so allotted to the devisees of Wm. Winchester and their heirs. On the 18th of January, 1837, William Winchester and George Winchester, ex- *171 eeutors and devisees in trust of Wm. Winchester, deceased, made a power of attorney stating that “for divers good causes and considerations, us thereunto moving, we have constituted and appointed, and by these presents do constitute and appoint, Wm. Armour and David Armour, of the town of Jackson, in the State of Tennessee, our true and lawful attorneys, for us and in our names, to sell either at public or private sale, for cash or on credit, in mass or by parts, all those pieces, lots and parcels of land, with the improvements and appurtenances, lying in and about the town of Memphis, which were, by the report of certain commissioners appointed at April session, 1829, of the County Court of Shelby county, assigned and allotted to us as devisees aforesaid,” etc., “it being our express desire and intent that the powers here given shall and may, at the discretion of our attorneys, be exercised either jointly or severally, for and in our behalf, to make all necessary bonds of conveyance and deeds in our name, with general warranty,” etc. This power of attorney was acknowledged before a notary public in Baltimore, on the 18th of January, 1837, and registered in Shelby county, Tennessee, on the 3rd of April, 1837. Wm. Armour alone acted under this power of attorney, and, as such attorney, on the 3 8th of April, 1840, conveyed lot No. 408 to one Jacques Joiner, signing the deed, “ William and George Winchester, executors, by their attorney in fact Wm. Armour.” Defendant, J. T. Leath, claims by conveyance under this deed. On the. 25th of April, 1840, a similar deed was made for lot 228, to Job Bledsoe, *172 which is claimed by conveyances therefrom by defendants, Flora and Thomas Turley. On the 13th of November, 1843, a deed for lot No. 249 was made by "William Winchester, surviving executor, by Wm. Armour, attorney in fact, to S. B. McNees; defendants B,. C. Binkley and others claim under this deed. On the 7th of March, 1839, a deed for lot No. 101 was made to Buddy Kimbrough, signed by William and George Winchester, executors, by Wm. Armour, attorney in fact; under this conveyance defendant Nath. Adams claims this lot. On the 8th of January, 1845, a deed was made for lot No. 106, to T. J. N. Bridges, by William Winchester, executor, by Wm. Armour, attorney in fact; under this conveyance defendant C. B. Church claims this lot.
The bills of complainants were filed in December, 1867, so that the several defendants had been in possession by themselves, and those through and under whom they cleraign their titles, for more than twenty years each. Upon this fact it is insisted for defendants that their titles are perfected by the operation of the Acts of 1839, ch. 26, • sec. 9, and 1859, ch. 91, secs. 1 and 2. Whether this defence is available or not, depends upon the proper construction of these statutes. The Act of 1839, ch. 26, sec. 9, simplified, is that whenever a deed has been registered for twenty years or more, it “ shall be presumed to be on lawful authoritiy.” This has reference to a deed executed by the grantor or maker himself, and not by attorney. After twenty years registration, such deed s presumed to be lawfully registered. The principle *173 of the statute is simply the principle of ordinary statutes of limitations differently applied. As there is no saving clause in it, it bars infants, married women, and others under disability, as effectually as persons sui juris. As a muniment of title, it can not be disputed on account of any defect or imperfection or informality in its registration. The simple fact that it has been on the register’s book of the proper county for twenty years or more, is conclusive evidence that it was properly placed- there. The object of the statute was the security of titles to real estate and the quieting of long possession of the soil. Matthewson v. Spencer, 3 Sneed, 520. But the operation of this statute was confined to deeds executed by the grantors or makers in person, and hence the Act of 1859-60 was passed to supply the omission as to deeds by attorneys in fact. This Act contains two provisions The first, as to the effect of the registration for twenty years or more of deeds made by attorneys in fact, when the probate was insufficient, or when there was no probate. The second, as to the effect of the registration for twenty years or more of the power of attorney under which the deeds were executed.
The intention of the Legislature is more clearly understood by examining the two provisions in the reverse order of that in which they stand in the statute. The second provision simplified is, that when a power of attorney has been registered for twenty years or more it shall be deemed good and valid in law to pass the estate conveyed. This makes the instrument registered good and valid as a power of at *174 torney after it has been ón the register’s books twenty years or more. The presumption that it was properly registered is not disputable, either by persons sui juris or those under disability. But whether the principal who gave the power of attorney had the title which he authorized the attorney to convey, or whether the power was still subsisting when the deed was made by the attorney, are questions not settled in this provision of the statute. The first provision of the statute' has reference to these objects. The first provision simplified is, that when a deed, purporting to be made by an attorney in fact, has been registered for twenty years or more, “it shall be presumed, until the. contrary is shown, that the deed was properly made by the attorney, and such deed, or a copy from the register’s book, shall be deemed valid to pass the title in the same manner as if it had been executed by the principal.” The presumption that the deed was properly made by the attorney is not conclusive, but disputable. The fact that the attorney had a power of attorney to make it can not be disputed, — that is settled by the other provision already considered; but whether the deed was made properly, so as to pass a valid title, is subject to be disputed. If this is not done successfully, then the deed is as effectual in passing the title as if it had' been made by the principal. But if it should be shown that the principal had no title to the estate, or that the attorney had executed the deed after his power had been revoked or had expired, the presumption would thereby be overturned, and it would be shown that the *175 deed was not properly made by the attorney. The presumption, however, stands, that the deed was properly made, until rebutted, and if not so rebutted it operates as a subsisting presumption as well against those under disability as those nob The legal effect of the two provisions viewed together is, to throw the burden of proving that the deed was not properly made by the attorney in fact, on those who dispute the fact, wherever it appears that the power of the attorney and the deed have been on the register’s book for twenty years or more.
It follows, in the present case, that the fact that the several deeds, executed by Armour, as attorney in fact of Wm. and George Winchester, executors, had been registered more than 20 years before the filing of the several bills, is not a conclusive bar to the relief sought by .complainants, but it imposes on them the burden of showing that the deeds were not properly made by the attorney in fact, as already explained. Complainants rely upon two grounds, on which they insist it is shown that the deeds were not properly made; first, that the power vested in Wm. and George Winchester by the will of Wm. Winchester, was not such as authorized them to make sales of the land by attorney in fact; second, if such power was so vested, that when the deeds were made the power had been revoked and had expired.
We proceed to examine these positions: 1. By reference, to the will of Wm. Winchester, it is found that he devises his lands to his “sons, Wm. and George Winchester, their heirs and assigns forever, in *176 trust, that they or either of them, or the survivor, and the heirs of the survivor, shall and may sell and dispose of all or any part thereof, at such, times, in such manner and upon such terms as to them shall seem best and most advisable,” for executing the trust, which was the payment of the two debts specified. The testator not only vests his two sons, or either of them, with power to sell all or a part of his lands for the payment of his debts, but to enable them the more effectually to execute the trust, he vests lhem with a fee simple title to the lands. The devise is to "Win. and George Winchester, their heirs and assigns. Either of them or their survivor, and the heirs of the survivor, may sell and dispose of all or any part thereof, and an unlimited discretion is given to them as to the time, manner and terms of selling. It is obviously a discretionary trust coupled, with the legal title, with strong evidences of unbounded personal confidence reposed in the trustees. In such cases the authorities are, that where there is a confidence in the trustee, and this is always deemed to be the case, unless the instrument creating the trusts authorizes the appointment of another, and a delegation of power to such third person, the office and duty of trustee can not be delegated except so far as relates to ministerial acts, where he may employ an agent who governs himself by his advice and direction in the management of the trust, he being responsible for his agent’s acts. 2 Wash. R. P., 206; Hill on Trusts, 175, 540; Lewin on Trusts, 228; Cole v. Wade, 16 Ves., 28 and note. This rule rests upon the purpose and intention of the *177 testator, as indicated in the personal confidence reposed in the trustee. But if that personal confidence goes to the extent of authorizing the trustee to select a third person to execute the trusts, he may do so without violating the rule, and such third person may legally carry out the trusts. In ascertaining the purpose and intention of the testator, we must interpret his language in the light of the circumstances which surrounded him at the time of making his will. He owned real estate in Maryland and Tennessee. At that time, 1812, he could not expect his lands in Tennessee to he made available in the payment of his debts without great trouble and embarrassment. But such was his confidence in his two sons, or in either -of them, that he embraces the Tennessee as well as the Maryland, lands in his devise to them, their heirs and assigns, and to leave them untrammelled in carrying out the trusts, he gives them unrestricted discretion as to the time, the manner and the terms of disposing of the lands. The power to dispose of the lands, in any manner that his sons might deem most advisable, may well bear the interpretation, in view of all the circumstances, that he entrusted them to dispose of the lands through third persons in whom they might have confidence. But after designating his two sons as testamentary trustees, to execute the trusts of his will in regard to the payment of his two debts specified, the testator closes by appointing the same two sons to be executors of his will. The payment of the debts of the testator was a duty devolving upon the executors. The fact that the specific *178 mode of raising the means of paying the debts is specified, and the duty of raising the means in that mode devolved upon the same two persons, who are afterwards appointed executors, furnishes persuasive evidence thatt the testator intended to draw no distinction between his two sons as testamentary trustees and executors. His purpose was to appoint his two sons his executors, and to vest in them specifically the legal title to his real estate in trust, for the purposes designated. The fair interpretation of the will is, that ¥m. and George were appointed executors with the specific powers and duties of testamentary trustees, just the same as if they had first been named executors, and then that the specific powers and duties enumerated had been conferred on them by name. In this view of the character of the trust imposed by the testator upon his two sons, they had the power, under the act of 1833, ch. 57, as such executors, to make agreements to sell, and to sell by attorneys, it appearing that the will had been duly executed and recorded according to law, and the power of attorney having been duly executed, proven and registered where the land lies. This statute applies to all cases in which persons as executors are authorized by wills to sell lands, and whatever authority is thus conferred upon them as such executors, they may execute by appointing attorneys to make agreements and sell for them. The act of 1833 was in force when the several deeds executed by Armour as attorney in fact were made, and governed his action in the premises. We have seen that by 'this will of *179 the testator, an extraordinary amount of discretion and personal confidence was vested and reposed in his two sons, as testamentary trustees and executors, and that by the fair interpretation of the unrestricted terms in which the trusts were communicated, as well as by the operation of the act of 1833, ch. 51, these trusts were susceptible of delegation. They were delegated to Wm. and David Armour, of Jackson, Tenn., on the 18th of January, 1837, by the execution of a power of attorney which invested them with ample powers. It appears in proof, that for some reason not explained, the debt to the Bank of Maryland remained unpaid when this power of attorney was made. Although no allusion is made in the power of attorney to the specific purposes for which it is made, it is to be presumed that it was done in discharge of the trusts of the will, for the purpose of providing means to satisfy the bank debt. The appropriation of the means, when raised, was reserved to the> executors, and therefore there was no necessity to allude to it in the power of attorney. The lands to be sold are described fully, and the authority is to sell any or all of the town lots, country tracts, ferry franchises, etc., “ either at public or private sale, for cash or on credit, in mass or by parts.” The executors manifestly reposed large confidence and vested much discretion in their attorneys, but not greater than the testator had reposed and vested in them by his will. The powers communicated to the attorneys in fact, were consistent with those existing in the executors. The power of attorney was registered on the 3d of April, 1837, and *180 was on the register’s books when the several deeds made by Wm. Armour, the acting attorney, were executed. The power of attorney and the several deeds from which defendants deraign their titles, had been on the register’s books for twenty years and more when complainants filed their bills. It follows that from the fact of the registration of the power of attorney and the deeds made in pursuance thereof, having been registered for twenty years and more, the law presumes that they were as valid to pass the legal titles as if the deeds had been made by the principal, unless it is shown that the power of attorney had been revoked or otherwise terminated before valid contracts of sale were made.
This brings us to the second question, whether the contracts for the sale of the several lots in controversy were made before the power vested in the attorney in fact was revoked or otherwise extinguished. It is not controverted in argument that if the attorney in fact entered into valid agreements for the sale of the lots prior to the 1st of April, 1837, when it is assumed the power terminated by the satisfaction of the bank debt, the defendants can successfully defend under such agreement, although the deeds from which they deraign their titles are dated subsequent to the 1st of April, 1837. Hill on Trusts, 717; 10 Vesey, 315. For the purposes of the defense, proof of the making of the title bonds by Armour as attorney in fact before the revocation of his powers, must be effectual against the claim of complainants, without regard to the fact that they may have been *181 under the disability of coverture when the bonds were executed. It is not contended for defendants that there is direct and positive proof that the several deeds were based on contracts in writing entered into prior to the 1st of April, 1837, but that facts and circumstances are proven, which in connection with presumptions arising from lapse of time and long acquiescence, are sufficient to establish the position that contracts were actually made prior to April 1st, 1878, which were not effectuated by deeds until afterwards. Whether the payment of the bank debt on the 1st of April, 1837, did operate per se to revoke the authority of the attorney in fact, will be considered hereafter.
Robertson Topp proves that Wm. Armour, who then resided in Jackson, Tennessee, was in Memphis on the 11th of March, 1837, and remained there at least until the 24th of March, 1837, trying to sell lots as attorney in fact of William and George Winchester, executors of Wm. Winchester, deceased. He says that on the 11th of March, 1837, he contracted with Armour for two lots, and on the 24th of March, 1837, Armour, as attorney in fact, executed to him a title bond for the lots. He says that Armour exhibited to him the will of Wm. Winchester, and a power of attorney from Wm. and George Winchester as executors, as his authority for selling. He states: “I have no doubt that during said Armour’s visit to Memphis he sold many lots to divers persons. I knew of a great many at the time, but the particular lots and persons have passed out of my memory.” He states that he knows that Thos. G." Johnson, W. D. *182 Dabney and "Walker & Atkins bought a large interest in the lots allotted in the partition of 1828 to Benj. Winchester, but he has no personal knowledge or recollection of the purchase of the lots in controversy by these parties from Wm. Armour. He says that after he had paid for the two lots he purchased of Wm. Armour 'as attorney in fact, his purchase having .been on a credit of two years, he went to Baltimore, and Thomas C. Murdock and C. Mason Campbell, heirs of Wm. Winchester, without objection or hesitation recognized and ratified the act of Arm-mour, and procured for him a deed from all the heirs, including the complainants and their husbands. On cross examination, Topp says, that besides the sale made to himself and one to M. B. Winchester, he has no knowledge of any sale he made, or the time when he made it; he cannot call to mind any particular sale he did make; he knows' he came down from Jackson at that time for the purpose of making sales.
Charles D. McLean proves, that in 1842 he was appointed with several others, by a decree of the Circuit Court of Shelby county, to partition among the devisees of Wm. Winchester, deceased, that portion of the Bice grant of 5,000 acres which had been allotted to them in common by the partition made in 1828. The petition for partition included the lots in controversy, as well as many others. When they came to make the division, the commissioners declined to include in their report the lots in controversy, because Wm. Armour and M. B. Winchester informed them. *183 that these lots had been sold by Wm. Armour as attorney in fact. This fact was stated in their report, which was accompanied by a list of lots subject to partition, furnished and signed by Wm. Armour. He states further, that in December, 1837, he was. employed as auctioneer by Thos. G. Johnson, W. D. Dabney and others, who he understood had sometime before bought said lots left out of the division, to sell them at auction. He had made this sale for Dabney, Johnson and others, the purchasers from Armour as attorney in fact. The sale was made to enable them to dispose of the lots on speculation. This sale fell through. He says: “I ■ think that Wm. Armour, or the agent and attorney of Wm. and George Winchester, the executors of Wm. Winchester, deceased, had sold the lots to the said Dabney, Johnson, McNees and others in the early part of the year 1837, for the title to these gentlemen, from the said Wm. Armour as such agent or attorney, was exhibited at the sale, to let the purchasers or bidders see the’ title under which Dabney, Johnson, McNees and others were selling. I did not read the paper or title, but it was in my hand while selling the lots and was handed to me by Dabney. It was handed to me when the sale began, and was examined by the purchasers. I did not read this writing, but it was considered by me and by others present as a deed of conveyance from Wm. Armour as agent and attorney for the lands. I cannot remember its exact date. It was, of course, prior to December, 1837, and I think bore date early in the year 1837. I had every confidence in the title, no one objected to *184 it in the bidding, and the bidders bid under that impression. I handed the paper back to the parties making the sale and have never seen it since.”
Witness proved that the commissioners who acted with him in the partition in 1842, were all dead; that the parties for whom he sold the lots in 1837 were dead, except McKees; that Wm. Armour was a man of high character, as was Marcus B. Winchester, and both are dead.
Sam’l B. McNees proves that he once owned one of the lots in controversy. He bought it in 1843 of Tilomas M. Fletcher, who is long since dead. Fletcher had a title bond for it signed by Wm. Armour, as attorney in fact for Wm. and George Winchester, executors,' but whether t¡he payees in the bond were Dab-ney, or Johnson and others, he cannot recollect. He applied first to Armour to buy, who referred him to Fletcher, as holding a title bond for it with part of the purchase money unpaid. He saw Fletcher and bought, paying Armour the balance of the purchase money and taking his deed, as agent and attorney in fact, the title bond being surrendered to him. He is positive that the bond was signed by Wm. Armour as attorney in fact, but he says he has no distinct recollection now as to the date of the bond; he can only remember that it had been made several years before, but the exact year or month, he cannot state. He is satisfied it was dated further back than 1840. He knows he noticed the date, but he cannot remember how much before 1840. it was dated.
J. T. Leath proves that in 1841 he and Barry *185 filed the petition for the partition of the portion of the Rice grant of 5,000 acres, which had been allotted to the devisees of Wm. Winchester. The petition was in the name of all the devisees and heirs of Wm. Winchester, including the present complainants and their husbands, and Marcus B. Winchester, who claimed an interest as assignee of Samuel Winchester, and in right of his wife, both of whom were devisees. He says the petition was drawn from the original or old division made to Wm. Winchester, from whom complainants claim, and not knowing what lots or parcels had been sold by Wm. Armour, attorney in fact, they therefore embraced in the petition the lots now in controversy. The correction, he says, was made in the further proceedings of the case by the commissioners reporting that they had left out of the division the lots in controversy and had divided the unsold lots, which report was confirmed. It is in proof that the partition made jin 1842 was acquiesced in by all the petitioners, and that they took their several shares in severalty, in pursuance of the division so made.
The share allotted to J. M. Campbell and his sister, Mary C. Murdock, in common, was soon afterward partitioned between them by deeds, by which they took their respective portions in severalty. The same is true as to the shares allotted in common to Lydia Jenkins and Wm. Armour, Jr.
By reference to the several deeds executed by. Wm. Armour as attorney in fact, to the several lots in controversy, it appears that two of them *186 refer to previous title bonds — those in the cases of Brinkley and Church. The former refers to a purchase by Fletcher made at a sale on the 26th of December, 1837, by Walker, Atkins and Dabney. This deed is dated in November, 1843. The other deed refers to a sale made by Johnson, Walker, Atkins and Dabney, on the first day of January, 1838, “as by transfer of the title bond doth appear.” This deed is dated on the 8th of January, 1845. The other three deeds make no reference to title bonds, but purport to be sales by Armour as attorney in fact, for cash received at their respective dates, in 1839, 1840 and 1845. Upon this proof, unaided by presumption, from the lapse of time or other circumstances showing long acquiescence, what is the fair deduction to be drawn as to the question of fact, whether the several deeds were based on contracts made prior to the 1st of April, 1837? It is satisfactorily shown that Armour was in Memphis for several weeks in March, 1837 for the purpose of making sales of lots, and that, he made sales of two lots to Topp, but if he sold others, as Topp thinks he did, the proof fails to show to whom they were sold, or whether any of those in controversy were then sold. The proof is satisfactory that in December, 1837, several persons claimed to have bought a number of lots of Armour, who employed McLean to sell them at auction. He is positive that they furnished a paper which they represented as a deed or bond for the lots from Armour, as attorney in fact. We think it may be fairly inferred from McLean’s evidence, and from the fact that two of *187 the deeds afterward made by Armour have special reference to title bonds, and to sales made by the persons who employed McLean to sell as auctioneer, that this association of persons had bought the lots now in controversy, or a portion of them, on speculation, and that they held Armour’s bond for the title. But McLean did not read the bond, and does not know its date, although he expresses the opinion that the purchase had been made by them early in 1837. . The proceedings which took place for the partition in 1841 furnish, strong evidence that Armour had sold the lots in controversy prior to that time, as he then so represented to the commissioners, which representation was embodied in their report and confirmed by the court as part of the decree in the case, and to which representation no exception was made by any of the parties, but which was acquiesced in and acted upon by the parties interested. This fact shows, that, although three of the deeds afterward made by Armour contains no reference to title bonds, yet that it is reasonably certain that he had sold these lots prior to the partition in 1841, and that title bonds for these, as well as the other two, had been made. While, therefore, we are warranted in concluding that under this proof the lots were sold before December, 1837, we are not satisfied, in the absence of presumption arising from lapse of time and circumstances of long acquiescence, that the sales were made prior to the 1st of April, 1837. Being satisfied by the proof that the several deeds made in 1839, 1840, 1843 and 1845 were executed in consummation of contracts prior to *188 those dates, it is necessary that it should also appear-that the contracts were made in a legal manner, and that at the times of making them, the attorney in fact had the power to make them. This is a fact to be proven like all others; positive proof is not required, but such proof as will warrant a legitimate presumption or inference that it exists. The fact that complainants are married women can have no influence in determining the weight of proof required to establish the fact. Marshall v. Stephens, 8 Hum., 159.
We adopt the rule that when there is a legal and an illegal mode of exercising a power or executing a trust, and the proof leaves it doubtful which has been used, the legal presumption in favor of innocent purchaser or meritorious claimants is, that it has been exercised in the legal mode. Wilburn v. Spofford, 4 Sneed, 704; 8 Hum., 159. Upon this principle we are justified in holding that the contracts for the sales of the lots by Armour were legally made by written agreements or title bonds, rather than by parol. - It is satisfactorily shown that the lots sold by Armour were paid for by the purchasers, and that the present defendants claim through regular conveyances. It also appears that Armour was vested with power to sell, but it does not appear that by the terms of his authority he was required to execute the power within any definite period of time, or in any specified mode. The will of Wm. Winchester indicated to him the object for which he was appointed attorney in fact. It was to raise the means to pay debts which had then been due for twenty-five years, although the testator had ex *189 pressed an anxiety that one of the debts should be speedily provided for. But the authority given indicated no special urgency in making immediate cash sales, as it gives the discretion to sell for cash or on credit. There is no proof from which it can he inferred that Armour had any reason to believe that his authority would be terminated by an early satisfaction of the debts by the executors in Maryland, nor is there any proof that when the executors discharged the bank debt, on the 1st of April, 1837, they gave their attorney in fact any notice of the fact, or that he was otherwise informed of the termination of his powers by the payment of the debt. Under these circumstances, can we presume that Armour made the contracts of sale before the bank debt was paid? “The presumption is always in favor of legal obedience and never against it,” as laid down by Judge Turley in Marshall v. Stephens, 8 Hump., 174. If it appeared that Armour knew that his power was to terminate on the 1st of April, 1837, after a lapse of twenty years — when the immediate actors in the transactions have all died,- when the parties immediately interested are shown to have remained quiescent and acquiesced in the acts of the agent for so long a time that their rights are barred, when it appears that the parties interested are cognizant of the acts of the agent, when the agent is shown to have been a man of high character — when these and other like circumstances are made to appear, the presumption would be reasonably made that the agent pursued the legal mode of executing his trust, and that it was executed in the time *190 prescribed, assuming that there was a prescribed time which was known to him. But we have seen in the present case that Armour had no knowledge that his powers as attorney in fact were limited to the 1st of April, 1837, nor any information of the event being about to happen, or of its having happened, on the happening of which his powers were to cease.
The only fact, therefore, which we can legitimately presume, in this state of the case, is, that he used the powers vested in him and executed the trusts faithfully and legally, so far as he was apprized of their nature and extent, not that he made the contracts prior to the 1st of April, 1837, but that whenever he did execute them he believed he was doing so in pursuance of his authority, whether that was done before or after the 1st of April, 1837. • The defendants are entitled to the benefit of the presumption of fidelity on the part of the attorney in fact; and while upon the proof, we can not say that it . satisfies us that the contracts, though legally made so far as being evidenced by title bonds is concerned, were entered into before or after the 1st of April, ' 1837. In this state of uncertainty as. to the fact, we are bound by the provisions of the Act of 1859, ch. 91, to hold, that as the deeds and power of attorney had been registered more than twenty years before the institution of the suits, we are to presume (the contrary not having been shown) that the conveyances were properly made by the attorney in fact, and that the deeds are valid to pass the legal title in the same manner as if the same had been executed by the principals. Upon the *191 construction of the Act of 1839, ch. 26, sec. 9, made in the case Matthewson v. Spencer, if these deeds had been made by William and George Winchester themselves, the fact of this registration for twenty years or more would have made them operative as well against complainants, who are under the disability of cover-ture, as against the other devisees and heirs who are mi juris.
In that case Judge McKinney.said: “The necessity and policy of the law are, in our opinion, alike applicable to the deeds of married women as to other persons, and we perceive no just reason why they should be exempted from its operation. No legislation, perhaps in the present condition of the country, is more urgently demanded, or more universally sanctioned, or promotive in a higher degree of the general interests of the community, than that which has for its object the security of titles to- real estate and quieting long possession of the soil.”
We have considered the case thus far upon the assumption that the discharge of the bank debt, on the 1st of April, 1837, operated in law as a termination of the power of William and George Winchester, as testamentary trustees and executors, to sell and convey other lands. To this proposition no exception can be taken. It is fully sustained by all the authorities. It has been further assumed that the power of Wm. Armour, as attorney in fact, terminated upon the termination of that of his principals, William and George Winchester, as such trustees and executors, and that as that event occured on the 1st of April, 1837, *192 no sales of lots made by him as such attorney in faot after that date could be valid. The principals are shown to be residents of Maryland, and the agent to be a resident of Jackson, Tennessee, at the time the bank debt was paid. The power of attorney, dated 18th of January, 1837, on its face gives power to sell at discretion, for cash or on credit. The will of Wm. Winchester shows that the power to sell was vested in the trustees and executors for the specific purpose of paying the two debts named. There was nothing settled in the will or power of attorney notifying the agent whén the power would be revoked or extinguished. It was to depend upon an uncertain future event of an entirely private character, and its occurrence could only be known to the agent from information to be derived from his principals or others. There is no evidence that any information was communicated by the principals or- others to the agent, as to the payment of the debts; but the power of attorney was allowed to remain in his possession unre-voked. Under its authority he proceeded to sell to purchasers, who, like himself, were ignorant of the occurrence of the event on which the power of the principals had been extinguished, by their own act, in paying the debt. The question is, were sales made under such circumstances, although they may have been made after the 1st of April, 1837, null and void, if the Act of 1859, ch. 91, was out of the way?
It was held by Judge Milligan in Murdock v. Johnson, 7 Col., 615, “as the better opinion, that the trustees took a limited fee, determinable on the fulfill *193 ment of the purposes of the trust, which instantly vested, under the will, in the residuary legatee.”
From this position he draws the following conclusions : “ We are, therefore, of the opinion that at the date of the title bond executed by ¥m. Armour as the attorney and agent of the trustees and executors of the testator, Wm. Winchester, deceased, on the 29th of December, 1837, the trustees had no legal title to the lands contracted to be conveyed, and, a fortiori, none at the time of the execution of the deed to Folkes in 1844. The title failing in the principals fails also in the attorney in fact. We readily accede to the correctness of the position as to the non-existence of any title in the trustees in December, 1837, but we cannot- concur in the deduction that their agent, Armour, acting under the power of attorney and in ignorance of the extinguishment of the power of his principals, could not make a sale to purchasers acting in good faith, paying fair considerations, and with no knowledge that the power of the agent had been revoked by the principals. In this connection it is to observed that by our registration law of 1831, ch. 9, sec. 13, it was enacted that revocation of powers of attorney must be proved, or acknowledged and registered, which revocation shall only take effect from the time it is registered, except as against persons who have notice of the revocation after its execution and before its registration. It is not necessary for us to enquire' whether a contract made by an agent whose authority had been revoked by the death of the principal, could, under any circumstances, be enforced *194 against the representatives of the deceased principal. It was said by Judge Green in Rigs v. Cage, 2. Hum., 351, that “the death of the principal is an instantaneous and absolute revocation of the authority of the agent, unless the power be coupled with an 'interest.” For this he cites 2 Kent, 645, which supports the position. On this question Judge Story, after referring to the rule of the common law as laid down by Judge Green, cites the Roman law to show that the acts of an agent done bona fide in ignorance of the death of his principal, were held valid and binding upon the heirs of the latter, and shows that similar principles have been imported into the commercial jurisprudence of the modern nations of continental Europe. In sec. 495 of his work on agency, he says: “Reasonable as those doctrines seem, and convenient as they must be admitted to be for the practical purposes of trade and commerce, it has been thought that they do not prevail in the common law, recognized either in England or in America. But,” he adds, “it may be doubted whether our law deserves such a reproach, at least to the full extent in which it is usually imputed to it. Regularly, indeed, where the act to be done must be done in the name of the principal, and not in that of the, agent, the authority is extinguished by the death of the principal, because it has then become incapable of being so executed.” In the case of Ish v. Cram, 8 Ohio St. R., 520, this question is ably discussed, and all the authorities collected and reviewed; and the conclusion of the court is, that the weight of authority *195 supports the position that it is only when the agent necessarily acts in the name of his principal in contracting, that his agency is absolutely and unconditionally revoked by the death, of the principal.
That court, while conceding such to be the weight of authority, maintained with' much 'earnestness that there is no sound reason for any distinction between the effect of a revocation by death and by the act of the principal. They say with great force, “now upon what principle does the obligation imposed by the acts of the agent after his authority has terminated really rest?” It seems to me the true answer is public policy. The great and practical purposes and interests of trade and commerce, and the • imperious necessity of confidence in the social and commercial relations of men, require that an agency when constituted should continue to be duly accredited. To secure this confidence and consequent facility and aid in the purposes and interests of commerce, it is admitted that an agency in cases of actual revocation is still to be regarded as continuing, in such cases as the present, towards third persons, until actual or implied notice of the revocation. And I admit that I can perceive no reason why the rule should be held different in cases of revocation by mere operation of law from the death of the principal. In the case of Cassidy v. McKenzie, 4 Watts and Serg., 282, Judge Rogers puts the ease thus strongly: “This money has been paid by the debtor in good faith, and received by the agent in good faith, and why should it not be good when the authority is revoked by death, as it is when expressly *196 revoked by the principal in his life-time? Can it be that a payment made to an agent from a foreign country, and from one of our cities to the Western States, employed for the special purpose of collecting debts, is void because his principal may have died the very day before the actual receipt of the money? ' It would be unjust to the agent and unjust to the debtor.” In the ease of Dick v. Page Bacon, 17 Missouri R., 234, the court were unanimous in the opinion that the rule, that the act of an agent done after the death of the principal without notice is void, only applies to those acts which must be done in the name of the principal, and not to those which the agent may do in his own name. But in the present oase, the agency of Armour was not revoked by the death of his principal, so that is not necessary to decide upon that question, but by an act of theirs which terminated their own powers. The agent being ignorant of the revocation, went on to make contracts with innocent purchasers, who had a right to act* upon the notice given to them by the registered power of the attorney which stood unrevoked on the register’s books. The rule applicable to such a case is thus laid down in Story on Agency, sec. 470: “In the next place let us consider at what time and under what circumstances the revocation, by the act of the principal, takes effect. And here the rule of our. law is equally clear and comprehensive and just. As to the agent himself, subject to what has already been stated, it takes effect from the time when the revocation is made known to him; and as third persons, when it is made known to *197 them and not before. Until, therefore, the revocation is so made known it is inoperative. If known to the agent as against his principal, his rights are gone; but as to third persons, who are ignorant of the revocation, his acts bind both himself and principal. Indeed, this is but another application of the known maxim of law and equity, that when one of two innocent persons must suffer, he shall suffer who, by his confidence, or silence, or conduct, has misled the others.” In 2 Kent, 644, it is laid down, “in the case of a lawful revocation of the power by the act of the principal, it is requisite that notice be given to the attorney, and all acts bona fide done by him under the power prior to the notice of the revocation, are binding upon the principal. This rule is necessary to prevent imposition, and for the safety of the party dealing with the agent. Even if the notice had reached the agent, and he concealed the knowledge of the revocation from the public, and the circumstances attending the revocation were such that the public had no just grounds to presume a revocation, his acts done under his former power would still be. binding on his principal.”
It is only necessary now to apply the rules established by the high authorities referred to, in determining whether the contract of sale made by Armour, as attorney in fact, though they may have been made after the bank was paid, were binding on the devisees and heirs of ¥m. Winchester. We find nothing in the record to impeach the bona fides of the attorney in fact; nothing that raises a presumption that he had notice of the payment of the debts; nothing to create *198 a doubt as to the good faith with which the lots were bought by the original parties to the contracts. . They were not required to see to the appropriation of the-price paid by them for the lots. There was nothing on the face of the power of attorney, or of the will of Wm. Winchester, which required them as men of ordinary prudence to enquire into the transactions of the executors in Maryland, to ascertain whether or not the debts were paid. It was enough for them that the will showed that the executors were vested with the title to enable, them to pay the debts, and with ample discretionary powers, as to the manner of selling the lands, and that their power of attorney remained on the register’s books unrevoked, and being used as authority for selling by an agent of high personal character and. a connection of the Winchester family;- and that this agent was using this authority with the knowledge of some of the parties in interest and without objection on their part; and that his acts in selling were placed by him on the records of the Circuit Court in a proceeding in which all the parties interested were parties, and embodied in the decree without objection. Upon these and other circumstances that might be enumerated, the original parties to the contracts may well rely to show that they were dona fide and innocent purchasers. To all this the present claimants of the lots may add the fact that all of the parties interested in the lots who are sui juris, including the husb.ands of the complainants, have stood by for more than twenty years, have set .up no claim to-the lots, have made no complaints of the conduct of *199 the agent, but have acquiesced until their claims have long ceased to exist by lapse of time, leaving none but the two complainants, who, at the end of more than twenty years, insist on their claims upon the ground that their rights are protected and preserved by their coverture.
For the reason stated, we are of opinion that they were bound by the contracts made by the agent appointed by the executors, and if that was not so, that they have failed to overturn the presumption that the deeds were properly made by the agent, arising from the registration of the deeds for more than twenty years. Upon both grounds the bill will be dismissed and the decrees of the Chancellor be affirmed with costs.